10 P.3d 654 (2000)
Jarvis D. RYALS, M.D., Petitioner,
v.
ST. MARY-CORWIN REGIONAL MEDICAL CENTER, a Colorado not-for-profit corporation; Pueblo Radiological Group, P.C., a Colorado professional corporation; Michael E. Ball, M.D., individually and as President of Pueblo Radiological Group, P.C.; Lynn Phelps, M.D.; Mark Forte, M.D.; Marc Johnson, M.D.; Gary Lamonte, M.D.; Mark Mountford, M.D.; Stan W. Jonas, individually and in his capacity as Interim *655 Chief Executive Officer of St. Mary-Corwin Regional Medical Center; Walter Sackett, individually and in his capacity as the Chief Executive Officer of St. Mary-Corwin Regional Medical Center, Respondents.
No. 99SC137.
Supreme Court of Colorado, En Banc.
September 18, 2000.
*656 Caplan and Earnest LLC, Sharon E. Caulfield, Sarah E. Meshak, Boulder, Colorado, Attorneys for Petitioner.
Kennedy & Christopher, P.C., John R. Mann, Daniel R. McCune, Dean A. McConnell, Denver, Colorado, Attorneys for Respondents St. Mary-Corwin Regional Medical Center, Stan W. Jonas and Walter Sackett.
Hogan & Hartson L.L.P., Kathryn Webb Bradley, John W. Cook, H. Thomas Coghill, Denver, Colorado, Attorneys for Respondents Pueblo Radiological Group, P.C.; Michael E. Ball, M.D.; Lynn Phelps, M.D.; Mark Forte, M.D.; Marc Johnson, M.D.; Gary LaMonte, M.D. and Mark Mountford, M.D.
Montgomery, Little & McGrew, P.C., Robert N. Spencer, Englewood, Colorado, Amicus Curiae for Colorado Medical Society.
Ken Salazar, Attorney General, Richard H. Forman, First Assistant Attorney General, Business and Licensing Section, Denver, Colorado, Amicus Curiae for Committee on Anticompetitive Conduct.
Justice KOURLIS delivered the Opinion of the Court.
This case deals with the question of whether a physician is required to file a claim against a hospital that has denied him privileges with the Committee on Anticompetitive Conduct (CAC) rather than with the court. We hold that if the denial of privileges does not arise out of professional review committee activity at the hospital, then the physician need not seek review before the CAC. In this case, St. Mary-Corwin Regional Hospital (the Hospital) denied Dr. Jarvis D. Ryals, a neurologist, privileges to read MRIs at the Hospital based on a long-standing exclusive contract between the Hospital and a group of radiologists. Ryals filed suit claiming that the Hospital had engaged in anticompetitive conduct. The trial court dismissed his suit, holding that Ryals was first required to exhaust his administrative remedies with the CAC. The court of appeals affirmed. See Ryals v. St. Mary-Corwin Reg'l Med. Ctr., 987 P.2d 865 (Colo.App.1999).
We reverse. We hold, based on the plain language of the Colorado Professional Review Act (CPRA) and the statutory scheme as a whole, that the CAC has jurisdiction only over those claims of anticompetitive conduct that arise out of professional review committee activity. Professional review committees assess physician qualifications, physician conduct, and the quality and appropriateness of patient care. In this case, the Hospital did not engage in any professional review committee activity in denying Ryals's privileges. Rather, the Hospital made a business decision unrelated to Ryals's qualifications or conduct. If that decision has antitrust implications, then Ryals's claims against the Hospital and other Defendants were anticompetitive conduct claims arising independently of a peer review process. Therefore, Ryals was not required to file his claims with the CAC before seeking a remedy in district court.

I.
The Hospital has employed Dr. Ryals as a licensed neurologist since 1976. Prior to 1995, the Hospital did not own an MRI scanner, and Ryals interpreted MRI scans for the Hospital's patients outside of the Hospital at Southern Colorado MRI, Ltd. (SCMRI). Ryals, the Hospital, and Pueblo Radiological Group (PRG) were joint partners in SCMRI. In December 1995, SCMRI closed. Shortly thereafter, the Hospital obtained its own MRI machines to read MRIs "in-house."
Because Ryals did not have privileges to read MRIs at the Hospital, Ryals began to make inquires regarding obtaining privileges. After several informal inquiries with the Hospital staff, Ryals submitted a request for privileges to the Hospital's Medical Qualifications Committee on February 1, 1996. PRG had a long-standing exclusive contract with the Hospital to perform radiology services at the Hospital. The Medical Qualifications Committee decided that this exclusive contract prevented other doctors from reading MRIs. Ryals wrote PRG on February 6, 1996 requesting PRG to renegotiate their exclusive contract with the Hospital so as to permit him to read MRIs. PRG declined.
*657 Ryals submitted a second request to the Medical Qualifications Committee, which the Committee again denied at its meeting on March 1, 1996. The Committee found that although Ryals was qualified to read MRIs, he was not eligible to do so because of PRG's exclusive contract. The Hospital's acting chief executive officer, Stan Jonas, wrote Ryals on March 4, 1996 to inform him of the Committee's decision to deny his request. On March 12, 1996, the Hospital Governing Board then passed a resolution affirming its exclusive contract with PRG. The resolution did not specifically address Ryals's requests for privileges. Ryals did not receive a copy of the resolution until May 29, 1996 when he requested a copy of the exclusive contract from the Hospital.
Ryals then filed suit against St. Mary-Corwin Hospital, Hospital officers, and PRG in district court claiming three antitrust violations, breach of contract, promissory estoppel, tortious interference with contractual and prospective contractual relations, and outrageous conduct. The defendants moved to dismiss the complaint alleging that Ryals failed to exhaust his administrative remedies by first filing his complaint with the Colorado Committee on Anticompetitive Conduct (CAC). The trial court agreed and granted the motion without an evidentiary hearing.
The court of appeals affirmed the trial court's decision, holding that Ryals must first present his claims to the CAC. See Ryals, 987 at 869. The court of appeals held that the CAC had jurisdiction because the Hospital's denial constituted a professional review activity within the parameters of the CAC's enabling legislation. See id. The court reached this conclusion by reasoning that the Hospital's Medical Qualifications Committee and the governing board operated pursuant to valid written bylaws, and therefore, they constituted professional review committees for the purpose of the CPRA. See id. The court further held that the Hospital's actions, taken as a whole, could constitute final action and appropriate notice of the denial of privileges to Ryals in these circumstances. See id. at 868. The court also held that the CAC's jurisdiction extended to Ryals's common law claims. See id. at 870. We granted certiorari.[1]

II.
Maintaining standards of patient care is of preeminent importance in a hospital. In service of that goal, hospitals rely upon peer review processes to oversee physician conduct and promote appropriate patient care. During the peer review process, a peer review committee may be critical of the physician, and may issue a corrective action or sanction. See Fredrick Yu, The Committee on Anticompetitive Conduct: New Agency on the Block, 21 Colo. Lawyer 31, 31 (1992). However, a peer review committee is necessarily composed of peers who may be competitors of the physician being reviewed. Accordingly, when a peer review committee issues an adverse decision, it is possible that the committee's decision was based not on a deficiency in the physician's performance, but rather on a desire to remove the physician from competition. See id. This possibility raises antitrust liability concerns.
In 1988, the Supreme Court ruled that a hospital's peer review committee was not immune from federal antitrust liability because the state did not actively supervise the committee. See Patrick v. Burget, 486 U.S. 94, 100, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). Because the committee did not qualify for immunity, the individual members of the peer review committee could be subject to *658 suit for violating federal antitrust laws. See id. at 102, 108 S.Ct. 1658. In order to qualify for state action immunity,[2] the Supreme Court held that a state must actively supervise the private peer review committee's activities so that the state exercises "ultimate control over the challenged anticompetitive conduct." Id. at 101, 108 S.Ct. 1658.
In order to assure the continuation of the peer review process, many states, including Colorado, reacted to Patrick by enacting legislation to establish the requisite level of state supervision. The Colorado Professional Review Act (CPRA), was Colorado's answer to the dilemma. See §§ 12-36.5-101 to -106, 4 C.R.S. (1999). It allows private entities to establish professional review committees that operate as an arm of Colorado's Board of Medical Examiners. See § 12-36.5-103(3)(a), 4 C.R.S. (1999). In the enabling legislation, the General Assembly observed that the Board of Medical Examiners could not feasibly assume responsibility over every single allegation that a physician's conduct deviated from a professional standard of care. See § 12-36.5-103(1). The legislature, therefore, intended to employ professional review committees to assist the Board in reviewing "in good faith the professional conduct of physicians, including the quality and appropriateness of patient care." § 12-36.5-103(2).
A hospital may establish a professional review committee as long as the committee operates pursuant to written bylaws, which are approved by the hospital's governing board. See § 12-36.5-104(4), 4 C.R.S. (1999). Professional review committees are charged with investigating the qualifications of a licensed physician or "the quality or appropriateness of patient care rendered by or the professional conduct" of any licensed physician. § 12-36.5-104(6)(a)(II); see also § 12-36.5-104(1) (stating that a professional review committee may be established "to review and evaluate the quality and appropriateness of patient care provided by and the professional conduct of any physician"). To assist the committees in carrying out these functions, the legislature expressly provided that the committees would be granted immunity from liability for their activities, as long as the committees' actions were taken in good faith. See § 12-36.5-105(1), 4 C.R.S. (1999).
If the professional review committee makes an adverse finding against a physician, the physician may appeal to the entity's governing board. The governing board then reviews the committee's work and takes final action on the recommendation of the professional review committee. See § 12-36.5-104(7)-(8). The CPRA defines a governing board as any board authorized to take action "regarding the recommendations of any authorized professional review committee." § 12-36.5-102(2), 4 C.R.S. (1999).
If a physician believes that a decision made by a peer review committee or a governing board stems from anticompetitive motivations, the physician may appeal the committee's decision to the Committee on Anticompetitive Conduct (CAC). See § 12-36.5-106, 4 C.R.S. (1999). The CAC is a state board comprised of four licensed physicians and one attorney with expertise in the area of antitrust. See § 12-36.5-106(2). In order to appeal to the CAC, the physician must have been "the subject of a final action by a governing board, which action results in the denial, termination, or restriction of privileges at or membership in or participation in an organization, and who believes that such action resulted from unreasonable anticompetitive conduct." § 12-36.5-106(7). The CPRA makes the CAC the "sole and exclusive remedy" for physicians believing their adverse peer review decisions were the result of anticompetitive motivations. Id. "Failure to exhaust this administrative remedy . . . shall preclude the right of de novo review on *659 the merits of the issue of unreasonable anticompetitive conduct." Id.
The CPRA limits the CAC's jurisdiction to "the sole issue of whether such final board action resulted from unreasonable anticompetitive conduct." Id. The CAC may hold a hearing to review the record and take evidence solely on the issue of anticompetitive conduct, "except when, in the discretion of the committee, the interests of a fair hearing demand otherwise." § 12-36.5-106(9)(f).
If the CAC finds that the final action of the governing board resulted from anticompetitive conduct, then the CAC may issue an order disapproving, setting aside, or modifying the final action. See § 12-36.5-106(9)(k). The CAC is not authorized to award money damages or grant any other equitable remedies. Following the CAC's final determination, the party may challenge the action of the governing board, rather than the CAC's review of the action, in district court. See § 12-36.5-106(10)(b).

III.
With that background, we now turn to the first question on certiorari: to wit, whether Ryals was required to present his claims to the CAC before seeking a remedy in district court. We conclude that the CAC's jurisdiction is limited to those claims arising out of professional review committee activity as defined in the CPRA. Because Ryals's claims did not arise from a professional review committee activity, the CAC lacked jurisdiction, and Ryals was not required to exhaust his administrative remedies with the CAC.
The question of the scope of the CAC's jurisdiction is a matter of statutory interpretation. This is a question of law, and therefore, we review the case de novo. See Fogg v. Macaluso, 892 P.2d 271, 273 (Colo. 1995).

A.
We recognize that general logic would lead to the conclusion that since Ryals alleged anticompetitive conduct claims and the General Assembly created the CAC to deal with claims of anticompetitive conduct, then a fortiori, the CAC should have heard this case. However, upon closer examination of the applicable legislation, we conclude that the CAC was not intended to be the repository of all claims of anticompetitive conduct between a physician and a hospital. Rather, the General Assembly limited the CAC's jurisdiction to issues of physician qualification, professional conduct, and quality of patient care, arising out of qualified professional review committee activities. See § 12-36.5-104(8). Qualified professional review committees are in turn limited to issues of physician qualifications, quality of patient care, and professional conduct. See §§ 12-36.5-104(1), -104(6)(a). As a result, the CAC's jurisdiction encompasses only antitrust allegations arising out of adverse decisions regarding physician competency.
The sections of the CPRA cross reference each other, and reinforce the conclusion that the scope of CAC's authority is limited to anticompetitive claims arising out of peer review activities assessing physician competence. For example, professional review committees are defined as committees authorized to review professional conduct and the quality and appropriateness of patient care. See § 12-36.5-102(3). In addition, professional review committees act as extensions of the Board of Medical Examiners to evaluate physician competence. See § 12-36.5-103(1). The overall purpose of the CPRA, which includes the establishment of the CAC, is to protect the public from unprofessional conduct, not from anticompetitive conduct. See id. (stating that the Board of Medical Examiners cannot assess every alleged deviation from the quality standards, professional conduct standards, or appropriate care standards); see also § 12-36.5-101(2), 4 C.R.S. (1999) (providing in the legislative declaration that the purpose of the CPRA is to protect members of the public who lack the knowledge, experience, or education to properly evaluate the quality of medical practice or professional conduct of physicians).
In addition, the CPRA contemplates that the CAC will not have jurisdiction over all claims. The statute expressly authorizes physicians to pursue judicial remedies for *660 claims outside the CAC's jurisdiction. See § 12-36.5-106(8) ("Nothing in this article shall preclude a physician or health care provider otherwise aggrieved by the final action of a governing board from seeking other remedies available to them by law, except as provided in subsection (7)"). We read that provision to state, in part, that claims not arising from professional review committee activity may be litigated in district court. This would include claims that are antitrust allegations separate from any peer review process.
A reading of a limited role for the CAC is further supported by the CAC's limited ability to provide remedies for an aggrieved physician. The CAC may only disapprove, set aside, or modify a governing board's decision. See § 12-36.5-106(9)(k). The agency has no authority to provide economic damages or other remedies at law. The agency's ability to conduct hearings and accept evidence is likewise limited. See § 12-36.5-106(9)(h).
Other sections of the CPRA also reflect an understanding that the CAC's role is expressly limited. Part Two of the CPRA is intended to conform the CPRA to federal law and regulations. That part defines "professional review action" as "an action or recommendation of a professional review body . . . which is based on the competence or professional conduct of an individual physician, which conduct affects or may affect adversely the clinical privileges of or membership in a professional society of the physician." § 12-36.5-203(3)(a), 4 C.R.S. (1999).[3] Part Two specifically excludes some activities from the professional competence or conduct of a physician, including the physician's competitive acts to retain business, the physician's association with a particular group of professionals, or any other matter not relating to the competence or professional conduct of the physician. See id.[4] These provisions focus professional review activities on the abilities and qualifications of physicians, rather than general hospital oversight or management.
The CAC's regulations similarly limit the scope of the CAC's jurisdiction. The regulations provide the CAC with jurisdiction over the final action of a governing board involving "at least one of the following subjects: qualifications of a member physician; quality of patient care; appropriateness of patient care; or the professional conduct of a member physician." 3 CCR 713-13, Rule 6(a)(1)(C). We normally will defer to an agency's own interpretation of its statutory mandate. See North Colo. Med. Ctr., Inc. v. Committee on Anticompetitive Conduct, 914 P.2d 902, 907 (Colo.1996). The agency regulations indicate that peer review procedures are designed to address deviations from accepted standards by a physician, rather than a hospital's business decisions or general policies to promote patient care. The regulations do not provide the CAC with jurisdiction over antitrust allegations as a category in and of themselves.

B.
Although we need not resort to legislative history, we note that the legislative history of the CPRA indicates that the General Assembly created the CAC in order to further the intended purpose of protecting peer review committees from antitrust liability, while still providing a limited remedy to physicians injured by anticompetitive decisions of a peer review committee. During committee debate, Representative Tim Foster stated:
Mainly what [the CAC] are charged with doing is reviewing any appeals geared solely for issues of anticompetitive behavior by the peer review committee. They're not intended to be an appellate board which *661 reviews any sort of admonition or other actions taken by the peer review committee, but to look at what the peer review committee has done in the context of the anticompetitive and antitrust [sic].
Hearings on S.B. 89-122 Before the Health, Env't, Welfare and Insts. Comm., 57th Legis. 1st Sess. (Colo.1989) (statement of Representative Foster). The legislation's sponsor, Dottie Wham, explained that the bill was a response to the Supreme Court's decision in Patrick, and that because of Patrick, "it has been very difficult to get physicians to serve on peer review. And, because that process is of great importance to us in assuring quality of care and appropriateness of care," the bill would offer antitrust protections. Id. (statement of Senator Wham).
As a result, we find that the General Assembly did not intend for the CAC's jurisdiction to encompass review of a hospital's denial of privileges that is unrelated to professional conduct. Courts cannot expand authority of an administrative agency beyond the statute's authorization. This is especially true when a statute derogates the common law. See Brooke v. Restaurant Servs., Inc., 906 P.2d 66, 68 (Colo.1995). A statute may modify or restrict a common law right "only to the extent embraced by the statute, which may not be enlarged by construction, nor its application extended beyond its specific terms." Farmers Group, Inc. v. Williams, 805 P.2d 419, 423 (Colo.1991)(quoting Robinson v. Kerr, 144 Colo. 48, 52, 355 P.2d 117, 119-20 (1960)).
As the CAC points out in its amicus brief, this court should exercise caution in broadly construing the CAC's jurisdiction. Were we to expand the breadth of the CAC's authority, we simultaneously would expand the scope of state action immunity established by the CPRA. The General Assembly has not suggested that either the State or the CAC should exercise supervision over a governing board's decisions regarding either economic efficiencies or general policy directives regarding patient care. To construe the CPRA broadly in these circumstances would move beyond the General Assembly's stated purpose. See, e.g., Common Sense Alliance v. Davidson, 995 P.2d 748, 753 (Colo.2000) (stating that courts should exercise caution to refrain from adding language to a statute).

C.
We turn then to the facts of this case. The outcome of this case hinges on whether the Hospital's denial of privileges was a decision regarding Ryals's competency that could fall within the rubric of professional review activities. The trial court granted Defendants' motion to dismiss and found that Ryals was required to file his claim with the CAC. However, the trial judge did not make any findings of fact as to the nature of the Hospital's actions. We, therefore, review the record de novo.
PRG argues that the governing board's resolution in this case was an effort to improve patient care, and thus, the governing board acted as a professional review committee. We disagree and conclude that the Hospital's actions are properly characterized as business decisions.
The Hospital's March 4, 1996 letter to Ryals informed him of the Medical Qualification Committee's decision to deny his privileges based on the Hospital's exclusive contract with PRG. The letter indicated that the reasons for the exclusive contract were "(a) to provide prompt and reliable coverage by qualified physician specialists to meet and satisfy [the Hospital's] patient needs for diagnostic imaging services, (b) to develop on-going quality assessment and continuous quality improvement programs . . . (c) to enhance the effective and cost-effective administration of [the Hospital's] diagnostic imaging department." Nothing in the record indicates that the Committee's decision was made as a part of a peer review process to assess Ryals's performance or credentials. Although the Committee couched the exclusive contract in terms of general concerns for patient care, its denial of privileges was based on the exclusive contract, and not on Ryals's competence or conduct as a physician.
The Hospital's governing board affirmed the exclusive contract on the grounds that such contracts:

*662 (a) arrange for and provide prompt and reliable coverage by qualified physician specialists to meet and satisfy Hospital's patient needs . . . (b) develop and implement timely and on-going quality assessment and continuous quality improvement programs . . . (c) enhance the efficient and cost-effective administration and management of Hospital . . . (d) coordinate and develop comprehensive and efficient educational programs.
The Hospital's governing board resolution similarly concerned the PRG exclusive contract and not Ryals's privileges. The resolution did not reference Ryals or his professional competence. Most importantly, the governing board resolution does not indicate that it was a review of an adverse professional review committee action. As we have explained, we read CPRA to provide that only the final action of a governing board relating to professional review committee activities may be appealed to the CAC.
Because the Hospital did not engage in a professional review committee activity with regard to Ryals's privileges, the CAC does not have jurisdiction over his anticompetitive conduct claims. Because Ryals was not required to file his claims with the CAC, no state administrative remedy existed for him to exhaust. Therefore, we conclude that the trial court and the court of appeals erred in their decisions to dismiss Ryals's complaint for lack of subject matter jurisdiction.

IV.
On appeal to this court, Ryals also contested the court of appeals' determination that the actions of the Hospital constituted a final action for purposes of the CPRA. Because we find that the CAC is without jurisdiction over Ryals's claims, we need not determine whether there was a triggering final action in this case.
Similarly, the third issue on which we granted certiorari was whether the CAC's jurisdiction extended to Ryals's common law claims. It is unnecessary for us to resolve this issue, as we determine that Ryals need not seek relief for any of his claims with the CAC before filing his claims in district court.

V.
We reject a broad reading of the CAC's jurisdiction. After considering the plain language of the statute, the structure of the CPRA as a whole, and the legislative history, we conclude that the CAC's jurisdiction is limited to claims of anticompetitive conduct arising from professional review activities that focus on a physician's qualification or conduct or on the quality of patient care. Because the Hospital's actions with regard to Ryals were not professional review committee activities as defined in the statute, we hold that the CAC was without jurisdiction over Ryals's claims. Accordingly, we reverse the judgment of the court of appeals, and remand the case to that court to return it to the district court for further proceedings consistent with this opinion.
Justice BENDER does not participate.
NOTES
[1] We granted certiorari on the following issues:

(1) Whether the court of appeals erred in holding that denial of Ryals's request for privileges to read MRI scans was a professional review activity subject to review by the Committee on Anticompetitive Conduct where the denial was based solely on the hospital's exclusive contract and not on Ryals's qualifications, professional conduct or quality of care.
(2) Whether the court of appeals erred in holding that a resolution of the hospital's governing board affirming an exclusive contract for imaging services constituted the board's final action denying Ryals's request for privileges where the resolution did not reference Ryals and was not provided to Ryals until two months after Ryals's request for privileges was denied.
(3) Whether the court of appeals erred in holding that Ryals was required to pursue his common law tort, contract and equitable claims before the Committee on Anticompetitive Conduct.
[2] In the Health Care Quality Improvement Act of 1986 (HCQIA), Congress provided some antitrust immunity for peer review action taken "in the reasonable belief that [it] was taken in the furtherance of quality health care." See 42 U.S.C. § 11112(a)(1) (2000). States are free to immunize other peer review actions that do not meet the federal standard. See Patrick, 486 U.S. at 105-06, 108 S.Ct. 1658. The CPRA in part duplicates the immunity provided by the HCQIA. See North Colo. Med. Ctr., Inc. v. Committee on Anticompetitive Conduct, 914 P.2d 902, 906 (Colo.1996).
[3] Part Two of the CPRA states that its provisions are intended to complement the provisions of Part One. See § 12-36.5-201, 4 C.R.S. (1999). To the extent that the parts conflict, the provisions of Part One should prevail. See id. Although the definition of professional review activity focuses more closely on the conduct of an individual physician, we find that the thrust of both parts is substantially the same, and that the parts may be read harmoniously.
[4] The HCQIA similarly defines professional review activities to exclude actions based on a physician's association with a professional society or a particular class of health care professionals or "any other matter that does not relate to the competence or professional conduct of the physician." 42 U.S.C. § 11151(9) (2000).